# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PAUL T. HARGEN-RODRÍGUEZ AND MARÍA L. AMARAL-BIBLIONI, AND THEIR CONJUGAL PARTNERSHIP,<br><br>    Plaintiff,<br><br>        v.<br><br>UBS TRUST COMPANY OF PUERTO RICO, UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, AND UBS FINANCIAL SERVICES, INC.,<br><br>    Defendants, | Civil No.<br><br>Re:<br><br>Racketeer, Influenced and Corrupt Organization Act, Securities Fraud, Breach of Fiduciary Duties, Declaratory Judgment, Breach of Contract, Damages.<br><br><u>Jury Trial Demanded</u> |

## <u>COMPLAINT</u>

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs PAUL T. HARGEN-RODRÍGUEZ ("Hargen-Rodríguez") and MARÍA L. AMARAL-BIBLIONI ("Amaral"), and their conjugal partnership, through the undersigned counsel, and respectfully states and alleges as follows:

## I.    INTRODUCTION

1.1    Hargen-Rodríguez appears to file this Complaint against UBS Trust Company of Puerto Rico ("UBS Trust"), UBS Financial Services Incorporated of Puerto Rico ("UBS PR"), and UBS Financial Services, Inc. ("UBS Financial") (jointly "UBS Defendants").

1.2    The Complaint seeks recovery of losses and damages caused by UBS Defendants for illegal acts constituting violations of federal and state law, including securities fraud and violations of the Racketeer, Influenced and Corrupt Organization ("RICO") Act.

1.3     The Complaint also seeks recovery of damages caused by UBS Trust for breach of its fiduciary duties towards Hargen-Rodríguez, and recovery of damages in the form of attorney's fees incurred in prior litigation due to wrongful involvement in litigation.

## II.     PARTIES

2.1     Plaintiff Hargen-Rodríguez is a natural person of legal age, resident of Aguadilla, Puerto Rico. He is married to co-plaintiff Amaral, who is also a natural person of legal age, and resident of Aguadilla, Puerto Rico. Hargen-Rodríguez and Amaral form a conjugal partnership. Hargen-Rodríguez, Amaral and their conjugal partnership are hereinafter jointly referred to as "Plaintiffs".

2.2     RICO enterprise and defendant UBS Financial Services Incorporated of Puerto Rico ("UBS PR") is a corporation organized under the laws of the Commonwealth of Puerto Rico with its principal offices located in American International Plaza, 10th Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

2.3     RICO enterprise and defendant UBS Trust Company of Puerto Rico ("UBS Trust") is a corporation organized under the laws of the Commonwealth of Puerto Rico with its principal offices located in American International Plaza, 10th Floor, 250 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

2.4     RICO enterprise and defendant UBS Financial Services, Inc. ("UBS Financial") is a Delaware corporation with its principal places of business in New York, New York, and at relevant times was a tenant and occupied office space at 250 Muñoz Rivera Avenue, San Juan, Puerto Rico.

2.5     UBS PR and UBS Trust are affiliated companies, both subsidiaries of UBS Financial. UBS PR, UBS Trust, and UBS Financial are hereinafter jointly referred to as "UBS Defendants".

### III.     JURISDICTION AND VENUE

3.1     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331, because Plaintiffs allege one or more violations of Section 10(b) and 15(c) of the 1934 Securities Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(c), and/or SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, which is subject to federal jurisdiction under 15 U.S.C. § 78aa, and pursuant to 18 U.S.C. § 1964(c), since Plaintiffs are alleging a violation of their rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961-1968.

3.2     This Court has supplemental jurisdiction over Commonwealth law or common law causes in action of this Complaint, pursuant to 28 U.S.C. § 1367(a), inasmuch as the facts, events and circumstances giving rise this Complaint stem from and/or refer to the same facts, events and circumstances giving rise to the federal claims.

3.3     Venue is proper pursuant to 28 U.S.C. §1391 in that a substantial part of the events giving rise to this Complaint occurred in this District.

### IV.     RELEVANT FACTS

**A.     FACTUAL BACKGROUND**

   ***i.     Execution of the Hargen Trust***

4.1     Hargen-Rodríguez hereby incorporates by reference paragraphs 1.1 through 3.3 of this Complaint.

4.2     Hargen-Rodríguez is the only son of late Robert Mason Hargen ("Robert Hargen").

4.3     Hargen-Rodríguez was born during Robert Hargen's first marriage to Mrs. Myrta Rodríguez Pou. Robert Hargen and Myrta Rodríguez Pou were married on July 11, 1942, until Mrs. Rodríguez's death on December 22, 1996.

4.4     A few years after his first wife's passing, Robert Hargen married Mrs. Nellie Sánchez-Carmona ("Sánchez-Carmona"), his second wife. Robert Hargen and Sánchez-Carmona were married on April 17, 2000.

4.5     On October 25, 2000, Robert Hargen executed Deed of Trust Number 44 and created an irrevocable grantor trust known as the "Hargen Trust".

4.6     The parties to the Hargen Trust were Robert Hargen, as grantor, and UBS Trust, as Trustee.

### ii.     *Terms of the Hargen Trust*

4.7     Robert Hargen designated UBS Trust as trustee of the Hargen Trust. As such, UBS Trust was obligated to maintain and conserve the assets of the Hargen Trust. Prior to June 10, 2003, UBS Trust was known as Paine Webber Trust Company of Puerto Rico.

4.8     Robert Hargen designated himself as the first beneficiary of the Hargen Trust.

4.9     Robert Hargen designated Sánchez-Carmona as the second beneficiary of the Hargen Trust. This designation would begin after Robert Hargen's death, if Sánchez-Carmona and Robert Hargen were legally married at the time of his death.

4.10    Robert Hargen designated his only son, Hargen-Rodríguez, as the third beneficiary of the Hargen Trust. This designation would begin upon Sánchez-Carmona's death,

if she became second beneficiary, or after Robert Hargen's death, if Sánchez-Carmona failed to become a beneficiary.

4.11    As per the terms of the Hargen Trust, Hargen-Rodríguez is entitled to the trust's assets for purposes of distribution without additional requirements or considerations.

### iii.    *Events prior to the death of Robert Hargen*

4.12    After the execution of the Hargen Trust, Robert Hargen funded the Hargen Trust with his private and personal estate.

4.13    This capital was invested by UBS Trust on behalf of the Hargen Trust for the benefit of its beneficiaries, pursuant the its duties under the law and the Deed of Trust.

4.14    UBS Trust invested capital belonging to the Hargen Trust using a Resource Management Account ("RMA") offered by UBS PR. UBS Trust is the account holder of the RMA.

4.15    UBS Trust accepted, ordered, permitted, suggested, recommended, purchased, sold and allowed securities investments made on behalf of the Hargen Trust using the Hargen Trust's capital and assets. UBS Trust accepted, ordered, permitted, suggested, recommended, purchased, sold and allowed these securities investments, including the transactions based on fraudulent conduct and misrepresentations, as was proven by the SEC, through means such as electronic mail, telephone communications and other means of communications used for placing and receiving securities orders.

4.16    After the Hargen Trust's execution and until Robert Hargen's death, UBS Trust disbursed dividends and rents generated by the investments made by UBS Trust to and for the benefit of Robert Hargen, as first beneficiary.

4.17    Robert Hargen passed away in the State of Florida on September 17, 2003.

4.18    Sánchez-Carmona was married to Robert Hargen at the time of his death. She lived with her family in the state of Tennessee.

4.19    Hargen-Rodríguez notified the news of Robert Hargen's passing to Sánchez-Carmona and her family. Sánchez-Carmona and her family were aware of Robert Hargen's passing. They attended Robert Hargen's funeral and published an obituary in his memory in a Puerto Rico newspaper.

4.20    Hargen-Rodríguez last spoke to Sánchez-Carmona and her family on the day of Robert Hargen's funeral.

4.21    One month after his Robert Hargen's death, on October 13, 2003, Hargen-Rodríguez sent an electronic communication (e-mail) to UBS Trust notifying and confirming his father's passing and Sánchez-Carmona's marital status, making her second beneficiary of the Hargen Trust. [See **Exhibit 1: Electronic mail of October 13, 2003**]

4.22    In his e-mail of October 13, 2003, Hargen-Rodríguez notified and confirmed to Mr. Claudio Ballester and Ms. Sara Torres, both employees of UBS Trust, that Sánchez-Carmona was married to his father when he passed and provided UBS Trust with Sánchez-Carmona's accurate physical and mailing address, and telephone number. [See **Exhibit 1: Electronic mail of October 13, 2003**]

4.23    Sánchez-Carmona's physical and mailing addresses, and telephone number provided by Hargen-Rodríguez, were accurate at the time they were notified to UBS Trust on October 13, 2003. [See **Exhibit 1: Electronic mail of October 13, 2003**]

4.24    The contact information provided by Hargen-Rodríguez to UBS Trust was the following: (a) physical and mailing address: 2435 Cedar Dale Drive, Germantown, TN 38139;

and (b) telephone number: (901) 752-1126. [See **Exhibit 1: Electronic mail of October 13, 2003**]

      4.25    In its e-mail, Hargen-Rodriguez stated as follows:

*Per our recent conversation, here is the address for Nelly Sanchez, my father's wife. She presently lives with her daughter, Denise Branly.*

*2435 Cedar Dale Drive*
*Germantown, TN 38139*

*The home phone number is: (901) 752-1126.*

*Please contact me after you review the terms of the trust with her so as to understand the outcome. In addition, I would like to request that statements of the trust account be sent to me on a monthly basis effective September, 2003.*

*Let me know should you have questions or concerns.*

*Regards,*

*Paul Hargen*

[See **Exhibit 1: Electronic mail of October 13, 2003**]

      4.26    However, UBS Trust failed to contact Sánchez-Carmona at this address or phone number, her then current address, and failed to contact Hargen-Rodríguez after at least attempting to contact Sánchez-Carmona at this address or phone number.

## B.   DEFENDANTS' ILLEGAL CONDUCT

###     *i.*   *General Conduct*

    4.27    UBS Trust accepted, ordered, permitted, suggested, recommended and allowed security investments made on behalf of the Hargen Trust using the Hargen Trust's capital and assets. These investments were made through UBS PR pursuant to misrepresentations of material facts made with knowledge, intention and intent to defraud, or with reckless disregard for the

truth or falsity, in furtherance of the scheme to generate revenues through the fraudulent sale of shares of UBS Defendants' Closed End Funds ("CEFs").

4.28    According to federal Internal Revenue Service forms filed by UBS Trust on behalf of the Hargen Trust, by 2003, Robert Hargen funded the Hargen Trust with capital ascending to $864,145.00. Similarly, according to federal Internal Revenue Service forms filed by UBS Trust on behalf of the Hargen Trust establish that, by 2003, the Hargen Trust had assets of $1,034,267.00.

4.29    UBS Trust, as trustee, had the express duty and obligation ". . . to maintain and preserve the [Hargen] Trust['s] Assets . . . ." This contractual obligation worked at unison with its other contractual, legal and fiduciary obligations as trustee to the Hargen Trust.

4.30    However, the illegal conduct carried out and perpetrated jointly and in concert by the Defendants caused the loss of over $766,014.64 in Hargen Trust's assets. The fraudulent conduct and material misrepresentations were carried out with full knowledge, intention and intent to defraud, or with reckless disregard for the truth or falsity.

4.31    A substantial amount of the capital and assets belonging to the Hargen Trust and held in trust by UBS Trust were invested in what is generally known as "closed end funds" or "CEFs".

4.32    The CEFs are closed-end investment management companies incorporated under the laws of the Commonwealth of Puerto Rico and available only to Puerto Rico residents. Since 1995, UBS PR offered its customers 23 CEFs. For all 23 CEFs, UBS PR served as primary underwriter and as sole or co-manager, and a division of UBS Trust served as their investment advisor. UBS Trust also served as administrator, transfer agent and custodian to 14 of the 23 CEFs. The CEFs are not registered with the Securities Exchange Commission, are not traded on

any exchange or quoted on any quotation service, and are non-marginable securities. UBS PR was been the only secondary market dealer or liquidity provider for the 14 sole-managed CEFs and the dominant dealer for several co-managed CEFs.

4.33    Nearly all of the CEFs invest in similar securities. The CEFs' investment portfolios are concentrated in Puerto Rico municipal bonds, which produce tax-free interest income, and the dividends the CEFs pay to their shareholders are tax-exempt to residents of Puerto Rico. For eligibility for such tax benefits, CEF portfolios have to be comprised of at least 67% in Puerto Rico issuers. The CEFs are significantly leveraged, financing approximately 50% of their total assets, and thus, as a leveraged product, bear the concomitant level of risk.

4.34    Although the CEFs invest a high percentage of their portfolios in Puerto Rico bonds, the CEFs are not fixed-income securities. The dividends payable to shareholders can vary based on a number of factors, including prevailing variable margin loan rates payable by the particular CEF, interest rates, the market value of the securities within the CEFs, and various fees and expenses.

4.35    UBS Trust is not registered with the Commission. It shares offices and certain personnel with UBS PR, and serves as the administrator, transfer agent and custodian to 14 of the 23 CEFs. A division within UBS Trust serves as an investment adviser to all 23 CEFs. UBS PR personnel served as members of the board of directors of all 23 CEF companies to which UBS Trust served as investment adviser and with respect to 14 of thee CEFs, UBS Trust served administrator, transfer agent and custodian. Both UBS Trust and UBS PR are supervised by UBS Financial.

4.36    The CEFs represent the largest single source of revenue for UBS PR and UBS Trust. For example, between 2004 and 2008, the CEF business generated 50% of annual total

revenues for UBS PR and UBS Trust combined, which included CEF advisory and administration fees, and primary and secondary market sales commissions.

4.37    UBS Defendants marketed its Puerto Rico CEFs mainly to its Puerto Rico retail customer base, such as the Hargen Trust, managed by UBS Trust. That customer base included some seniors and retirees, and a number of them who invested in CEFs depended on monthly dividend income from the CEFs to supplement their payments from Social Security, such as Robert Hargen and Sánchez Carmona, beneficiaries of the Hargen Trust.

4.38    Financial advisors from UBS Trust and UBS PR also promoted UBS PR's dividend reinvestment program, which was an important selling point of the CEFs. Under this word-of-mouth/unpublished monthly program, customers, like UBS Trust as trustee of the Hargen Trust, could elect to receive dividend reinvestment shares – issued by the CEFs at the Net Asset Value of the Funds ("NAV") – and immediately sell them back to UBS PR at the then-existing market price, earning premiums of up to 45%. This program was highly attractive to many of UBS PR's and UBS Trust's senior customers, who depended on the income from their CEF shares.

4.39    The UBS Defendants knew investors were seeking stable, consistently-priced securities to protect their investment or retirement income. This requirement is expressly included as part of the Deed of Trust. The UBS Defendants were also aware that consistently high share prices were important to promoting the dividend reinvestment program which relied on high market price premiums relative to the CEFs' NAVs.

4.40    Throughout 2008 and early 2009, UBS PR priced the CEFs to reduce volatility and maintain high premiums to NAV. UBS PR's pricing of the CEFs was under the exclusive discretion of Carlos J. Ortiz ("Ortiz") and Miguel Ferrer (""Ferrer"). UBS PR used its CEFs

inventory account to purchase excess supply of CEFs shares for which UBS PR could not find real customers and in that way manipulate pricing.

4.41    The purpose of this conduct was to derive revenues from a market that otherwise would not have generated the same level of interest since the price and yield was generated exclusively by material misrepresentations in violation of federal securities regulation knowingly perpetrated by UBS Defendants.

### ii.    *Material misrepresentations and illegal conduct*

4.42    During the same time period, however, in periodical account statements and other promotional publications delivered through the mail, the UBS Defendants misrepresented to Plaintiffs that market forces such as supply and demand determined CEF prices and the overall value of the Hargen Trust.

4.43    UBS PR and UBS Trust knew and omitted to disclose to clients, including the Plaintiffs and the Hargen Trust, that CEFs prices were controlled exclusively by UBS PR through its manipulation of market forces by purchasing excess shares not acquired by real customers. For example, a January 2008 UBS PR brochure entitled "UBS Family of Funds" posted on the company's website stated that: "[m]arket forces such as supply and demand and the yield of similar type products determine the price of closed end fund shares." This statement fails to disclose that "demand" is controlled and determined by UBS PR's decision to purchase more or less outstanding CEFs shares. They controlled their fate and return.

4.44    During the same time period, Hargen-Rodríguez received correspondence from Magda Broco, Investment Associate from UBS PR, which contained these same material misrepresentations regarding the limited role of market forces in determining CEFs prices and return and the UBS PR's real role in determining its pricing and return.

4.45    In addition, UBS PR published CEFs prices in the business section of the daily newspaper El Vocero de Puerto Rico. The newspaper simply listed CEFs share "prices." UBS PR omitted disclosing in the listings the prices represented only what UBS PR termed "indicative" prices. Indicative prices were simply what UBS PR thought the prices should be, but did not represent any commitment by UBS PR to buy or sell at that price. UBS PR's also failed to disclose that the prices included a 3% sales commission.

4.46    The CEFs share prices in UBS PR customers' monthly account statements delivered through the mail, such as the account statements for the Hargen Trust, were materially false in that they described "market values." As with the newspaper prices, these prices were simply what UBS PR thought they should be, not true market prices and failed to disclose that the CEFs prices were controlled exclusively by UBS PR through its manipulation of market forces by purchasing excess shares not acquired by real customers.

4.47    Rather than reduce CEFs prices, for the next several months, UBS PR continued to make repeated requests to UBS Financial to temporarily increase inventory limits, which increased to $45 million at the end of July, and to $50 million in December 2008, in order for Defendants to continue to maintain a market for CEFs based on misrepresentations of the truth about the nature of the market and UBS PR's role in manipulating the CEFs prices.

4.48    Furthermore, on behalf of UBS PR made only small changes to CEFs share prices once or twice a month during this period. As UBS PR's CEFs inventory grew from May through August 2008, UBS PR did not change prices for 9 CEFs on any trading day. For example, from May through December, UBS PR changed the price of one fund only once for PR Fixed Income Fund I, one of its CEFs. In the case of PR Investors Tax-Free Fund I, the trading desk quoted the same price every day from May through August 2008, and changed the price on just three

trading days through December, even with UBS PR's share inventory rising to $3 million. For the PR Fixed Income Fund IV, a $460 million fund, UBS PR kept the share prices between $9.60 and $9.70 every day from May through December 2008.

4.49    UBS PR knew set CEFs share prices to maintain a consistent yield. They also knew prices were both at a premium to NAV and atypically high compared with comparable closed-end funds.

4.50    These unchanging and consistently high prices in the face of declining NAVs, increased customer selling relative to customer demand, and other unfavorable market conditions were in contrast to the representations of UBS PR that market forces determined CEFs share prices.

4.51    The UBS Defendants attempted to generate customer demand by promoting the CEFs at a UBS PR Investor Conference in June 2008. At that conference, Ortiz, speaking on behalf of UBS PR, promoted the CEFs' extraordinary "market returns" and low risk and volatility, but failed to disclose that share prices and liquidity were highly dependent on UBS PR's support of the CEF secondary market. Even mentioning that the market goes through periods of illiquidity knowingly failed to mention that the market was fully dependent on UBS PR's purchase of outstanding shares and that UBS PR dictated their pricing and yield.

4.52    If any employee or manager at UBS PR had mentioned to Plaintiffs or to UBS Trust, as trustee of the Hargen Trust, that the market was manipulated by UBS PR's purchase of outstanding share not acquired by real customers and that UBS PR dictated its price exclusively, the Hargen Trust would have averted its eventual losses.

4.53    After the Investor Conference, UBS PR directed its CEFs head traders to develop sales "stories" for brokers, regarding particular CEFs for which UBS PR had substantial

inventory positions. UBS PR instructed its CEFs head traders to inform investment associates and other members of the UBS PR and UBS Trust sales force, which was shared, that the CEFs desk was willing to offer the CEFs with the highest inventory levels at reduced prices by reducing the typical five cent-per-share markup the desk got on sales. UBS PR's head traders met with financial advisors from UBS PR and UBS Trust to provide information about those CEFs while omitting to disclose that the funds were those with the highest inventory levels.

4.54    By August 2008, customer demand for CEFs shares was further reducing. As a result, UBS PR's and UBS Trust's management met on August 12, 2008. UBS PR's and UBS Trust's management expressed uneasiness that financial advisors were concerned about the concentration of customers' investments in CEFs and about the continued CEFs offerings.

4.55    Notwithstanding their knowledge of the weak demand for CEFs shares in the secondary market, UBS PR and UBS Trust repeatedly misled its customers throughout the fall of 2008 and continued to promote CEFs sales. In numerous e-mails and phone calls, UBS PR and UBS Trust management misstated the strength, stability and liquidity of the CEFs market. UBS PR and UBS Trust management did not disclose to the sales force the liquidity issues in the secondary market, or that UBS PR was keeping the CEFs prices high by increasing its CEFs inventory.

4.56    The sales force solicited sales of the CEFs during this period, including two new primary CEFs offerings totaling $66 million. UBS PR top management sent several e-mails to the UBS PR and UBS Trust sales force strongly promoting the anticipated returns of the new offerings while assuring that the offerings would have little if any effect on the CEF secondary market. Yet, privately, they discussed that the directives to move forward with the primary

offerings was made knowingly and willfully disregarding UBS PR's high CEFs inventory holdings.

4.57   UBS PR prepared a presentation to its sales force in connection with the new CEFs offerings. This presentation provided as reasons that customers, including UBS Trust as Trustee of the Hargen Trust, should invest in the new funds that, among other things, "[f]und inventory levels are low, trading volumes are at all-time high (annualized), and prices/yields are aligned with current market conditions." Not only were these statements false and misleading, given the record high inventory levels and UBS PR's support of market prices, but in terms of UBS Trust, it was gross infringement of its legal and contractual fiduciary duties of loyalty and against self-dealing.

4.58   UBS PR failed to disclose material facts to investors, including UBS Trust as Trustee of the Hargen Trust, concerning the significant secondary market supply and demand imbalance, that UBS PR was using its inventory account to support CEFs market prices and liquidity to prevent price declines and maintain yields, and that CEFs prices and liquidity were highly dependent on the efforts of UBS PR's sales force and UBS Trust's sales support to maintain customer demand for the shares.

4.59   UBS PR failed to disclose material facts to its own sales force, including to UBS Trust, during this same time. Prior to the fall of 2008, UBS PR had routinely displayed inventory levels for each CEFs in the firm's inventory sheets that were circulated to its financial advisors. However, for the month leading to the new offerings, the daily CEFs inventory sheets sent to financial advisors reflected a maximum of 50,000 shares per CEFs, rather than the actual number of shares owned by UBS PR.

4.60    In February and March 2009, UBS PR's persistently high CEF inventory levels and the CEFs shares' significant price premiums over NAV raised concerns of UBS Financial' then-Chief Risk Officer ("Chief Risk Officer") and other executives.

4.61    In March 2009, UBS PR's management e-mailed a number of UBS Financial executives seeking a temporary increase of inventory levels from $50 to $55 million to buy CEF shares from customers selling their reinvestment shares. The reason given for the request was to presumptively address the supply and demand imbalance in the CEF market. This request was denied and instead UBS PR was ordered to reduce its inventory levels to $30 million in CEF shares.

4.62    UBS Financial Chief Risk Officer expressed his concern to other UBS Financial senior executives that although a supply and demand imbalance existed in the CEFs secondary market, CEFs prices remained high with a significant difference between NAV and the price quoted by the trading desk, in some cases over 40%. He further alerted the executives that due to the fact that UBS PR's internal CEFs trading limits were already exceeded because UBS PR had not yet reduced its inventory to its permanent limit, there is a significant likelihood that clients wishing to sell the shares received through the dividend reinvestment program will be unable to do so, and not due to purported periods of illiquidity.

4.63    Moreover, after a review of UBS PR's pricing method for the market values of the CEFs, the Chief Risk Officer concluded that: UBS PR was the *sole* CEFs liquidity provider (disproving claims of periods of illiquidity), UBS PR should reduce its CEFs inventory to limit its risk exposure and promote prices that *accurately* reflected real supply and demand, UBS PR ran a significant concentration risk that was inherent to the CEFs business, which could not effectively be reduced.

4.64    This resulted in a further reduction of inventory levels. UBS PR was ordered to reduce its inventory levels to $12 million in CEFs shares.

4.65    In response, UBS PR and UBS Trust came up with a scheme internally called "Objective: Soft Landing." This scheme consisted in purchasing from clients the minimum amount of CEFs shares possible while lowering UBS PR's own CEFs shares prices to keep ahead of any client open orders in terms of lowest offer price in the market. This scheme is a clear violation of law and fiduciary duties of care, loyalty, and good-faith.

4.66    UBS PR and UBS Trust pursued this scheme and effectively lowered their CEFs share prices to undercut the pending customer CEFs share sell orders, solicited new and existing customers for their own CEFs shares, including UBS Trust as Trustee of the Hargen Trust, by means of telephone conferences and electronic mails, to buy these shares without disclosing the fact that UBS PR was selling its own inventory due to an order from UBS Financial to reduce its inventory levels and while lowering its CEFs share prices below its customer sell orders, that UBS Financial had limited UBS PR's inventory purchases to dividend reinvestment share sellers, and that they arranged transactions in conjunction with offers by affiliated CEFs to have the funds repurchase newly issued shares from customers so UBS PR could sell its own CEFs shares to those customers. Remember, UBS Trust acted as investment advisor and had management occupying board positions in most of these CEFs.

4.67    UBS PR and UBS Trust did not disclose to its customers or beneficiaries that it was drastically limiting the use of its inventory levels to support the CEFs market by purchasing outstanding CEFs shares. Instead, UBS PR continued to accept customer limit orders without disclosing that it was undercutting those limit orders to sell its own shares first. UBS PR and UBS Trust also failed to disclose the conflict of interest created by recommending CEFs to

investors and beneficiaries while selling its own shares, limiting its participation in the CEFs market, and having funds purchase customers' share with the sole purpose of having UBS PR sell these same clients its own shares. In essence, UBS Defendants were minimizing their exposure to the imminent CEFs collapse by increasing their customers' exposure, such as the Hargen Trust, by lying and withholding material truths from them or by using its absolute control in furtherance of its self-interest and profits, such as UBS Trust.

4.68    UBS PR's and UBS Trust's conflicts of interest with its customers, such as the Hargen Trust, were exacerbated because UBS PR, which shared personnel and office space with UBS Trust, and both of which shared management with the CEFs and who performed other services from the CEFs, such as investment advice, controlled the market for the CEFs and investors could not go elsewhere to sell their CEFs shares. In essence, customers, such as the Hargen Trust, had to compete with UBS PR to sell shares in a market that UBS PR participated, dominated, and held almost absolute control, all while depending on UBS Trust, an affiliate of UBS PR with whom it shared offices, personnel, and management through their common parent.

4.69    Moreover, on March 31, 2009, UBS PR made misrepresentations and omissions to hundreds of customers, including UBS Trust as Trustee of the Hargen Trust, at a UBS PR Puerto Rico Investor Conference about the CEFs superior returns and consistent liquidity levels. In fact, UBS PR management knowingly failed to disclose that it was the *sole* provider for CEFs liquidity and that any "period of illiquidity" was exclusively attributable and under the control of UBS PR, which was ordered by UBS Financial to lower its inventory to levels where the CEFs bubble would inevitably burst… As it subsequently did, causing damages to Plaintiffs and losses to the Hargen Trust.

4.70    Also, UBS PR published a full-page advertisements in the daily newspaper El Vocero de Puerto Rico, as well as television spots promoting the conference. The purpose of the mass media campaign was to promote a false and misleading message to investors, customers and potential customer that the secondary market for CEFs had high liquidity and market driven prices, which contradicted UBS Defendants' knowledge that the market was in fact imbalanced because sellers significantly outnumbered buyers, that UBS PR solely fixed the prices for CEFs shares, that the market dependent on UBS PR's purchase of outstanding CEFs shares to create the illusion of a strong market driven by real supply or real demand, that UBS Financial had ordered UBS PR to reduce its inventory levels to lower exposure to risk and that it was doing so by undercutting its own clientele.

4.71    At the conference, UBS PR made a presentation about the CEFs' secondary trading market and misrepresented that CEFs liquidity was increasing and CEFs prices were stable as a result of supply and demand in an open market, which was clearly not true. In fact, the CEFs were experiencing a significant supply and demand imbalance caused by UBS PR and UBS Trust, which had been using its own inventory and funds under their management, such as the Hargen Trust, to support the fraudulent CEFs prices and disguise the lack of real liquidity and forces in the purported market for CEFs. Furthermore, UBS PR and UBS Trust omitted disclosing that they had been recently ordered by UBS Financial to reduce inventory, which effectively increased supply and lowered prices, and that to comply with this directive, UBS PR lowered its own CEFs share prices by unjustly competing with its customers who wanted to sell their shares and also buying fewer outstanding CEFs shares.

4.72    Other false and fraudulent statements made through mass media include an interview published in El Vocero de Puerto Rico on April 24, 2009. Ferrer, speaking on behalf of

UBS PR, specifically addressed the CEFs market and stated that in the face of other, poor-performing markets, the CEFs share prices had been stable and performed well. Notwithstanding, UBS PR knowingly omitted that the CEFs share prices were driven by their own purchase of CEFs shares, falsely maintaining prices at a certain level and avoiding the CEFs share price to reflect real supply and real demand for these shares, and that UBS PR had been recently ordered by UBS Financial to reduce inventory which effectively increased supply and lowered prices, and that to comply with this directive UBS PR lowered its own CEFs share prices unjustly competing with is customers and buying fewer customer shares, and that it was acting in concert with UBS Trust and several of the CEFs themselves.

4.73    The fraudulent conduct continued by taking advantage of a CEFs board members authorized CEFs share repurchase program. These repurchase programs were proposed by UBS PR, since executives for it and for UBS Trust's also held prominent positions at the boards of directors of 14 sole-managed proprietary CEF companies. The purpose was to have the CEFs purchase outstanding shares from UBS PR's and UBS Trust's customers in order to have UBS PR sell its own CEFs shares, from its own inventory, to those same UBS PR's and UBS Trust's customers. UBS PR did not disclose to those UBS PR's and UBS Trust's customers that a material basis for recommending those specific funds was to reduce UBS PR's largest aged inventory positions.

4.74    In June 2009, to discourage customer sales of CEFs shares, the UBS PR instituted a requirement that any customer order to sell over 10,000 CEFs shares required approval of a branch office manager.

4.75    By September 30, 2009, UBS PR had reduced its CEFs inventory to about $12 million. However, UBS PR's pending sell orders book on the same day showed approximately

$72 million in unexecuted UBS PR's and UBS Trust's customer sell orders that had fraudulently accumulated over the prior 6 months. Defendants knowingly left their customers, such as the Hargen Trust, out to dry.

4.76    When UBS Defendants stopped inflating the CEFs secondary market by buying outstanding CEFs shares and dumping 80 percent of its own shares unto its customers, CEFs prices dropped.

4.77    Defendants effectively created and inflated, and eventually pierced, a fictitious CEFs market by making knowingly false private and public statements, knowingly creating a illusory market for CEFs funds, and competing against its own clients while controlling the CEFs price, undercutting its clients sell orders, limiting its inventory, dumping its share unto its customers via a repurchase program authorized by CEFs whose board was partly made up of UBS Defendants' employees, all causing substantial losses for its clients, including the Hargen Trust.

4.78    The Hargen Trust suffered significant financial losses as a result of the illegal and fraudulent conduct implemented and carried out by UBS Defendants.

4.79    In 2013, the Puerto Rico bond market, the underlying asset upon which the CEFs were created, declined. However, the decline only made evident that the excessive leverage employed by the CEFs, up to 50% of the total CEFs assets, fact that was known to UBS Defendants but was disregarded. UBS Trust acted as investment advisor and asset manager to 14 of these sole-managed CEFs, and UBS PR's and UBS Trust's executive held prominent positions at 14 CEF boards. This illegal scheme and conduct caused a substantial decrease in the value of the CEFs.

4.80    UBS Defendants had first-hand knowledge of the excessive leverage employed by the CEFs companies. Executives for UBS PR and UBS Trust held prominent positions in the boards of director of the 14 sole-managed proprietary CEFs, to which UBS Trust also served as administrator, transfer agent and custodian. Moreover, UBS PR personnel served as members of the board of directors of all 23 CEFs companies to which UBS Trust served as investment adviser.

## C.    SUMMARY OF UBS PR'S PATTERN OF RACKETEERING ACTIVITY

4.81    Plaintiffs bring this action under the RICO Act against the UBS PR since it conspired with related entities and engaged in a pattern of material misrepresentations and other illegal conduct constituting securities fraud under federal law and regulation, as alleged above. UBS PR acted through its enterprise, which is made up of UBS Trust, shared personnel and employees who also occupied prominent position at some of these CEFs, or that acted as their investment advisor. They acted to achieve a common purpose of generating profits that the CEFs share market would not have generated had not been for the fraudulent sale of securities scheme. UBS PR perpetrated this conduct for years, including the scheme to lower its risk and position at the expenses of their own clients' risk and exposure upon having seen the imminent collapse of the CEFs shares bubble it had created.

4.82    The Hargen Trust is a trust fund managed by UBS Trust, whom, as stated, shares personnel and offices with its affiliate, UBS PR. The Hargen Trust was managed exclusively by UBS Trust. UBS Trust failed to contact Sanchez-Carmona, the beneficiary of the Hargen Trust at said time, albeit knowing her accurate and current contact information, which was provided to it by Hargen-Rodriguez.

4.83    As a consequence of its enterprise and implementation of their scheme, UBS PR violated the RICO Act by perpetrating a fraudulent sale of securities. UBS PR sold and the Hargen Trust acquired CEFs shares in connection with the fraudulent sale of securities by means of material misrepresentations. UBS Trust, as trustee of the Hargen Trust, aided and abetted the UBS PR's conduct and enterprise by using the Hargen Trust capital and assets to purchase securities they knew were set at a false price not base in market forces and offered as part of a scheme to defraud clients by dumping upon them UBS PR's own CEFs shares inventory by instructions of UBS Financial. The Hargen Trust was in a position of helplessness, since UBS Trust failed to contact Sánchez-Carmona, albeit knowing her accurate contact information. This fraudulent conduct caused significant financial losses to the Hargen Trust and to Plaintiffs since the value of its assets decreased in excess of $766,014.64. This scheme to defraud also causes millions of dollars in losses to other CEFs shares owner who, like Robert Hargen, entrusted their life savings to UBS Trust.

4.84    For instance, the Hargen Trust fraudulently acquired on January 30, 2008, a total of 14,000 CEFs shares of PR Fixed Income Fund V Inc., totaling an investment of $140,103.25. By December of 2013, after UBS PR and UBS Trust had implemented their scheme to defraud their clients by bursting the bubble they created by manipulating market forces and setting CEFs prices without disclosing these facts to its clients,  this investment had lost a total of $87,043.25. The losses of income reinvested in this security amounted to $8,683.53.

4.85    In another example, the Hargen Trust also fraudulently acquired on September 24, 2003, a total of 16,600 CEFs shares of Puerto Rico Fixed Income Fund Inc., totaling an investment of $166,005.25. By December of 2013, after UBS PR and UBS Trust had implemented their scheme to defraud their clients by bursting the bubble they created by

manipulating market forces and setting CEFs prices without disclosing these facts to its clients, this investment had lost a total of $116,205.25. The losses of income reinvested in this security amounted to $2,953.30.

4.86    Other CEFs investments that were acquired as part of the fraudulent scheme designed and implemented by UBS PR causes losses to investments fraudulently purchased by UBS Trust on behalf of the Hargen Trust on December 27, 2004 (-$17,026.45), March 27, 2000 (-$33,909.75), February 8, 2000 (-$65,737.87), November 29, 2005 (-$5,802.60), and May 29, 2001 (-$59,170.55).

4.87    The concentration of investments resulting from the UBS PR 's fraudulent sale of securities was such that almost half of the assets of the Hargen Trust were purchases of CEFs shares.

4.88    After the death of Robert Hargen in 2003, on January 24, 2008, Magda T. Broco, then Investment Associate of UBS PR, communicated via e-mail with Hargen-Rodriguez regarding an investment in CEFs shares. In her electronic mail, Ms. Broco and UBS PR fraudulently conveyed to Hargen-Rodriguez that prices were based on "daily market fluctuations" and that they were subject to "market risks", without disclosing that they controlled and manipulated the markets by their own participation in the purchase of outstanding CEFs shares, that UBS PR exclusively set the prices for CEFs, that they were selling UBS PR's inventory to reduce its exposure to risk by lowering its inventory levels, as ordered by UBS Financial. [See **Exhibit 2: E-mail from Magda T. Broco on January 24, 2008**]

4.89    After the death of Sánchez-Carmona on May 22, 2014, Plaintiffs and their Conjugal Partnership started to receive rent payments from the Hargen Trust. These rents are

conjugal property, and they are drastically reduced as a result of the fraudulent sale of securities and the RICO violations carried out by UBS PR herein described in detail.

**D.** **EVENTS RELATED TO UBS TRUST'S NEGLIGENT CONDUCT**

 ***i.*** ***UBS Trust's failure to contact Sánchez-Carmona of the Hargen Trust***

4.90 From the time of Robert Hargen's death until April of 2013, UBS Trust did not contact Sánchez-Carmona or her representatives.

4.91 On April of 2013 and after receiving correspondence sent to her by UBS Trust as trustee of the Hargen Trust, Sánchez-Carmona contacted UBS Trust through legal representation retained by her daughter and attorney-in-fact, plaintiff Denise Branly.

4.92 During the period of time between Robert Hargen's death and April of 2013, Hargen-Rodríguez never requested UBS Trust or any UBS Trust affiliate not to contact Sánchez-Carmona or her family after Robert Hargen's death.

4.93 During the period of time between Robert Hargen's death and April of 2013, Hargen-Rodríguez never agreed with UBS Trust or any UBS Trust affiliate about not contacting Sánchez-Carmona after Robert Hargen's death.

4.94 Hargen-Rodríguez only began to receive any payments or money from UBS Trust or from the Hargen Trust after Sánchez-Carmona's death. He did not receive any moneys from the Hargen Trust while Robert Hargen was alive or while Sánchez-Carmona was alive.

4.95 Notwithstanding that Hargen-Rodríguez never had an obligation to contact Sánchez-Carmona or her family, or to have UBS Trust contact Sánchez-Carmona or her family, on October 13, 2003, in good faith, Hargen-Rodríguez provided UBS Trust with Sánchez-Carmona's accurate physical and mailing address, and telephone number via an e-mail sent to

UBS Trust's employees, Mr. Claudio Ballester and Ms. Sara Torres. [See **Exhibit 1: Electronic mail of October 13, 2003**]

4.96    UBS Trust, knowing the accurate physical and mailing address, and telephone number of Sánchez-Carmona, chose not to contact her at said accurate contact address and telephone. UBS Trust's failure to contact Sánchez-Carmona was the result of its negligent conduct.

4.97    UBS Trust alleged to have tried to contact Sánchez Carmona at other addresses or contact information, but it knew and ignored her accurate and contact information provided to it by Hargen Rodríguez through his e-mail of October 13, 2003.

4.98    During the period of time between Robert Hargen's death and April of 2013, UBS Trust reinvested the rent proceeds from the Hargen Trust's assets into its corpus.

4.99    UBS Trust reinvestment of the Hargen Trust's rent proceeds also had the effect of furthering the scheme designed and implemented by UBS Defendants to illegally collect revenue based on material misrepresentations and omissions in the fraudulent sale of securities.

4.100   UBS Trust had discretion to reinvest the rents produced by the Hargen Trust, as per the terms of the Deed of Trust.

4.101   However, UBS Trust pursued these reinvestments with knowledge of the material misrepresentations and fraudulent conduct being carried out by the UBS Defendants.

4.102   Through her legal representation, on April of 2013, Sánchez-Carmona made an extrajudicial claim to UBS Trust requesting payment of a sum of money that allegedly amounted to the total rents fraudulently reinvested by UBS Trust into the Hargen Trust for the purchase of CEFs shares during the period of time between Robert Hargen's death and April of 2013.

4.103   The sum of money that allegedly amounted to the total rents fraudulently reinvested by UBS Trust is $664,477.14.

4.104   Hargen-Rodríguez was notified of Sánchez-Carmona's request and he expressed to UBS Trust that they should meet and discuss all relevant issues prior to any payments being issued from the Hargen Trust; however, the ultimate decision rested on UBS Trust's discretion as trustee.

4.105   UBS Trust denied that Sánchez-Carmona ever had a right to the trust's assets or corpus and, thus, rejected her extrajudicial claim.

4.106   Hargen-Rodríguez opposed the payment of past due rents to Sánchez-Carmona from the Hargen Trust's assets or corpus.

4.107   Notwithstanding, Hargen-Rodríguez knew and expressed to UBS Trust that Sánchez-Carmona had a right to demand payment of rents from UBS Trust's own funds.

4.108   Hargen-Rodríguez knew and expressed to UBS Trust that the only possible outcome of the lawsuits filed initially by Sánchez-Carmona, and subsequently by her successors, was that UBS Trust would have to pay out its own funds the rent proceeds not disbursed to Sánchez-Carmona, which was the result of UBS Trust's failure to contact her at the accurate address, provided to it by Hargen-Rodríguez in its electronic correspondence of October 13, 2003. [See **Exhibit 1: Electronic mail of October 13, 2003**]

4.109   Once she contacted UBS Trust, Hargen-Rodríguez never opposed payment of monthly rents to Sánchez-Carmona, which at the time were being generated by the Hargen Trust. Sánchez-Carmona received her first monthly rent payment from the Hargen Trust on July of 2013. The payment was issued by UBS Trust.

4.110   Starting in October of 2013, UBS Trust started issuing monthly recurring payments to Sánchez-Carmona from the Hargen Trust.

4.111   UBS Trust filed a civil action for Declaratory Judgment in Puerto Rico Court of First Instance, Superior Court of San Juan. UBS Trust requested the state court to determine the rights and obligations of Sánchez-Carmona and Hargen-Rodríguez, among others. This case is still pending and is identified as UBS Trust Company of Puerto Rico v. Paul T. Hargen, *et al.*, Civil Case No. K AC2013-1015 (901) ("First State Case").

4.112   In the First State Case, the original defendants were Hargen-Rodríguez and Sánchez-Carmona, who was still alive at the time of filing but was subsequently substituted with the members of her estate upon her passing.

4.113   Notwithstanding having knowledge of the First State Case, Sánchez-Carmona, through her alleged attorney-in-fact Denise H. Branly, her daughter, filed a second state court case against UBS Trust, UBS Financial Services Incorporated of Puerto Rico, Hargen-Rodríguez, Amaral-Biblioni, and their Conjugal Partnership. The second state court case is captioned Sánchez Carmona v. UBS Trust Company of Puerto Rico, *et al.*, Civil Case No. K PE2014-0305 ("Second State Case").

4.114   During the pendency of both state court cases, Sánchez-Carmona passed away on May 22, 2014, in the State of Florida.

4.115   Sánchez-Carmona's death was informed to the parties and to the Commonwealth Court on May 30, 2014, in a motion filed by Denise H. Branly, requesting substitution as Sánchez-Carmona's successor.

4.116   On that same date, May 30, 2014, the state Court dismissed the Second State Case without prejudice for want of jurisdiction. The state court concluded that Denise H. Branly failed to establish her standing as representative of Sánchez-Carmona.

4.117   Soon after, the state court also denied Plaintiffs' request for substitution and ordered them to litigate their claims in the First State Case, which had the same parties and the same controversies.

4.118   The judgment dismissing the Second State Case and all orders therein is final.

4.119   Upon Sánchez-Carmona's death, Hargen-Rodríguez became the sole beneficiary of the Hargen Trust. As such, on October of 2014, UBS Trust started issuing monthly dividend and/or rent payments to Hargen-Rodríguez from the Hargen Trust.

4.120   To this day, UBS Trust has not performed the distribution of the trust's assets in favor of Hargen-Rodríguez, albeit the request made by him to UBS Trust to proceed with distribution without delay.

4.121   In order to solve the pending controversy, UBS Trust amended its First State Case in order to substitute Sánchez-Carmona as defendant and include the members of her estate in her place. Her estate was made up of Denise H. Branly, Keith Branly and Steven Louis Hodes ("Sánchez-Carmona's successors"). As such, Sánchez-Carmona's successors were joined as defendants in the First State Case and were all served with process by publication.

4.122   However, Sánchez-Carmona's successors filed individual motions to dismiss for want of personal jurisdiction for insufficient process and insufficient service of process in the First State Case. These motions were never addressed by the Commonwealth court. The First State Case is pending and accruing attorney's fees.

4.123   On December 2, 2014, on or about the same date as when they filed the individual motions to dismiss, Sánchez-Carmona's successors filed a federal case against Hargen-Rodríguez, his wife, his conjugal partnership, and the UBS Defendants. The federal litigation was styled <u>Denise Hodes Branly, et al. v. UBS Trust Company of Puerto Rico, et al.</u>, Civil No. 14-01880 (CCC) ("Federal Case").

4.124   As a result of UBS Trust's negligence, Hargen-Rodriguez was made to incur in significant attorneys' fees to defend himself, his wife and his conjugal partnership from the claims made by Sánchez-Carmona and her successors; notwithstanding, he owed no duties to Sánchez-Carmona or her successors, and that the duty to protect the Hargen Trust's assets falls exclusively on UBS Trust.

## E.   NATURE AND EXTENT OF DAMAGES

### i.   *Damages arising from Defendants' fraudulent sales of securities and RICO violations*

4.125   Hargen-Rodríguez became the beneficiary of the Hargen Trust on May 22, 2014, upon the passing of Sánchez-Carmona, the Hargen Trust's second beneficiary. Until that day, Hargen-Rodríguez had been in a position of legal and practical helplessness.

4.126   The Hargen Trust had heavily invested in CEFs by virtue of UBS Trust's fraudulent and malicious conduct as trustee of the Hargen Trust and holder (client) of the RMA.

4.127   The Hargen Trust was managed exclusively by UBS Trust, as it sole Trustee. UBS Trust was the only entity entrusted with the responsibility of preserving its capital and assets. However, through the fraudulent and malicious conduct herein described, jointly carried out with UBS PR and UBS Financial, the Hargen Trust suffered losses in excess of $766,014.64.

4.128   Specifically, as a result of UBS Defendants' joint fraudulent, illegal, malicious, and willful conduct, as has been described herein, the Hargen Trust lost in 2013 a total of

$538,479.02 in market value. At the end of 2013, other losses and income considered, the Hargen Trust's value had reduced from $1,214,164.01 to $726,705.13, a net loss in value of $514,458.88.

4.129   As stated, by this day, the Hargen Trust's value has diminished north of $766,014.64. This is over 60% of its value by the start of 2013. This drastic and dramatic reduction is the direct and indirect result of UBS Defendants' joint fraudulent, illegal, malicious, and willful conduct, as has been described herein.

4.130   The Hargen Trust still owns CEFs shares as a result of UBS Defendants fraudulent conduct.

4.131   The fraudulent conduct perpetrated by UBS Defendants was concealed for years to Hargen-Rodríguez and to Sánchez-Carmona.

4.132   She was beneficiary to the Hargen Trust after Robert Hargen's death, event made known to UBS Trust by Hargen-Rodríguez on October 13, 2003.

4.133   Sánchez-Carmona was not contacted by UBS Trust for over a decade after becoming the Hargen Trust's beneficiary. During this time, UBS Trust reinvested the dividends and rents of the Hargen Trust and furthered its fraudulent and malicious conduct, carried out jointly with UBS PR and UBS Financial, collecting commissions, fees and other revenues for the UBS Defendants.

4.134   Now that Hargen-Rodríguez is the sole beneficiary, since the Hargen Trust still owns CEFs shares, pursuant to its scheme to illegally collect revenue based on material misrepresentations and omissions, he faces a losses north of $760,000.00 if he decided to pursue the distribution of the assets of the Hargen Trust, defeating the intention of Robert Hargen –to safeguard the capital originally invested by him in benefit of his only son, Hargen-Rodríguez.

ii.     *Damages related to UBS Trust's failure to contact Sánchez-Carmona*

4.135   The litigation related to UBS Trust's failure to fulfill its legal, fiduciary and contractual duties as Trustee included three (3) different cases.

4.136   In all cases, the merits revolved on whether UBS Trust failed to perform its duties and breached its obligations as Trustee by failing to contact Sánchez-Carmona, even though it had her accurate contact information since the first month after Robert Hargen's passing in 2003.

4.137   In all cases, the merits revolved on whether UBS Trust negligently allowed rent proceeds and dividends payable to Sánchez-Carmona unduly accumulate, thus creating an increasing potential liability for close to a decade due to its failure to contact Sánchez-Carmona at the accurate address and telephone which it held since the first month after Robert Hargen's passing in 2003.

4.138   UBS Trust knew or should have known that its conduct, failing to contact Sánchez-Carmona, even though it had her accurate contact information since the first month after Robert Hargen's passing in 2003, would result in Hargen-Rodríguez being wrongly dragged into a litigation when it knew he had no duty towards Sánchez-Carmona or her successors and that he had not in any way conspired with UBS Trust to keep rent proceeds and dividends from Sánchez-Carmona over the years.

4.139   Hargen-Rodríguez incurred in significant legal expenses and fees in defending himself, his wife his conjugal partnership and their interests in actions against UBS Trust for its failure to perform its duties and breach of obligations.

4.140   Hargen-Rodríguez owed no duties to Sánchez-Carmona or Sánchez-Carmona's successors. Also, Hargen-Rodríguez, by notifying UBS Trust of Sánchez-Carmona's marital status, whereabouts and telephone contact information, placed UBS Trust in perfect position to

perform its legal, fiduciary and contractual duties as Trustee. However, UBS Trust failed to perform its duties, which in turn gave rise to costly and unnecessary litigation and expenses.

4.141   As a result, Hargen-Rodríguez incurred in attorney fees in excess of $125,000.00 over the course of over two years of litigation and two separate cases, in two distinct forums.

4.142   The relevant litigation was brought by a third party, first by Sánchez-Carmona and then by Sánchez-Carmona's successors, to which Hargen-Rodríguez owed no fiduciary or contractual duty whatsoever. Notwithstanding, Hargen-Rodríguez was dragged into a litigation whose only source was UBS Trust's negligent and/or grossly negligent conduct of failing to contact Sánchez-Carmona after Robert Hargen's death upon knowing her marital status and whereabouts, which were accurately and timely provided to it by Hargen-Rodríguez, in good faith.

4.143   Ordinarily, the litigation should have been between the third-party and UBS Trust, since Hargen-Rodríguez never owed any duties to Sánchez-Carmona or her successors. In any case, -Rodríguez exceeded his calling by placing UBS Trust in perfect position to timely and accurately contact Sánchez-Carmona or her successors, which it failed to do.

4.144   If UBS Trust had contacted Sánchez-Carmona or her successors at the time Hargen-Rodríguez provided it with the accurate physical and mailing addresses, and her telephone number, and if UBS Trust had paid Sánchez-Carmona the rents and dividends to which she was entitled to as second beneficiary of the Hargen Trust, obligation owed to her by UBS Trust, none of the litigation related to UBS Trust's failure to pay rents when due would have ever taken place and Hargen-Rodriguez would not have had to defend himself, his wife and his conjugal partnership in said cases.

4.145   It was foreseeable for UBS Trust that failure to pay rents to Sánchez-Carmona or failure to safely deposit rents on her behalf would become fair grounds for litigation, particularly since Hargen-Rodríguez timely and duly placed UBS Trust in a position to contact Sánchez-Carmona at the time of Robert Hargen's death.

4.146   UBS Trust was in a position to avoid or reduce the unnecessary expense and attorney's fees incurred by Hargen-Rodríguez upon first receiving notice of Sánchez-Carmona's claim. Had UBS Trust recognized its obligation towards Sánchez-Carmona or accepted Hargen-Rodríguez's invitation to avoid litigation, the expense and attorney's fees incurred by Hargen-Rodríguez would have been significantly lower.

4.147   In the end, UBS Trust's failure to meet its legal, contractual and fiduciary duties towards Sánchez-Carmona caused the litigation and resulted in Hargen-Rodríguez having to incur in unnecessary attorney's fees in excess of $125,000.00.

## V.   CLAIMS FOR RELIEF

### COUNT I
### *(Section 10(B) and Rule 10b-5(A) of the Exchange Act against UBS Defendants)*

5.1   Plaintiffs hereby incorporate by reference paragraphs 1.1 through 4.147 of this Complaint.

5.2   From at least as early as 2006 through 2013, the UBS Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities to the Hargen Trust.

5.3   From at least as early as 2006 through 2013, the UBS Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of securities to the Hargen Trust.

5.4     From at least as early as 2006 through 2013, the UBS Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly, willfully or recklessly engaged in acts, practices and courses of business which operated or would operate as a fraud or deceit in connection with the purchase or sale of securities to the Hargen Trust.

5.5     This fraudulent conduct and misrepresentations in connection with the purchase or sale of securities proximately caused damages to Plaintiffs. Up to this day, the extent of the damages and losses suffered by Hargen Trust and Plaintiffs are in excess of $766,014.64, as a result of the conduct described above.

5.6     As a result of UBS Defendants' established fraudulent conduct and material misrepresentations, Plaintiffs are entitled to recover from the UBS Defendants the total net loss in value of the Hargen Trust, together with any and all excess commissions, underwriting, administration, and other fees unduly charged by UBS Defendants in connection or in the furtherance of their fraudulent, willful, illegal, malicious, and/or grossly negligent conduct and misrepresentations. These amounts are estimated at $200,000.00.

5.7     Plaintiffs estimate that the total amount to which they are entitled from UBS Defendants from the violations described in this cause of action amount to $966,014.64.

### COUNT II
*(RICO Act Section 1962(c) against UBS Defendants)*

5.8     Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.7 of this Complaint.

5.9     Plaintiffs and the UBS Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

5.10    UBS PR participated and managed its operations, through its management and personnel, which shared offices and personnel with UBS Trust and UBS Financial. The UBS Defendants met to plan, organize, implement, and control their fraudulent acts and omissions alleged herein. UBS PR and UBS Trust shared executives in prominent positions of the CEFs boards and UBS Trust, which shared personnel and offices with UBS PR, acted as investment advisor to all 23 CEFs.

5.11    UBS PR controlled the performance of the CEFs scheme. A large majority of the income generated by UBS PR and UBS Trust was the product of the fraudulent sale of CEFs shares. For years UBS Defendants concealed that the prices were not based on market forces but on their manipulation of demand by purchasing outstanding CEFs shares. UBS Defendants sent communications in the form of statements, made public announcements and media publications, and sent communications via electronic mail to Plaintiffs in which UBS PR and UBS Trust concealed that UBS PR the party solely responsible for setting the CEFs prices, which was also manipulated by them. The purpose of this scheme was to further earn several streams of revenue from one single source: the fraudulent sale and dumping of CEFs shares based on material misrepresentations and omissions of facts.

5.12    UBS PR sold millions of CEFs shares to customers in Puerto Rico, including the Hargen Trust. The Hargen Trust purchased thousand of CEFs shares, fraudulently induced by UBS PR. These transactions were for the most part unknown to its beneficiaries. In the period between 2003 and 2008, the Hargen Trust completed at least four transaction of CEFs purchases in connection with the fraudulent actions and omissions, and violations of RICO Act, alleged

herein. However, UBS PR made several written and verbal material misrepresentations to the public, to UBS Trust and to Hargen-Rodríguez himself.

5.13    As alleged, the UBS PR, together with UBS Trust and UBS Financial, engaged in the fraudulent sale of securities, as alleged herein.

5.14    As a result, Plaintiffs suffered injuries in the form of financial losses in excess of $766,014.64. Plaintiffs also suffered injuries in the form of loss of income, mental anguish and suffering by knowing that the last will of Robert Hargen failed to materialize as a result of UBS Defendant's illegal actions and omissions. These damages are estimated at $200,000.00.

5.15    However, pursuant to 18 U.S.C. § 1964, treble damages against UBS Defendants is hereby respectfully requested, increasing the demanded amount to $2,898,043.92.

### COUNT III
### *(Art. 410 of the Puerto Rico Uniform Securities Act against UBS Defendants)*

5.16    Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.15 of this Complaint.

5.17    From at least as early as 2006 through 2013, the UBS Defendants, directly or indirectly, knowingly, willfully or recklessly, by means of a false statement of a material fact or omitting to state a material fact needed to prevent that any statement made, in the light of the circumstances under which it was made, lead to misunderstanding, offered and/or sold a security to the Hargen Trust.

5.18    This fraudulent conduct and misrepresentations in connection with the purchase or sale of securities proximately caused damages to Plaintiffs. Up to this day, the extent of the damages and losses suffered by Hargen Trust and Plaintiffs are in excess of $766,014.64, as a result of the conduct described above.

5.19    As a result of UBS Defendants' fraudulent conduct and misrepresentations, Plaintiffs are entitled to recover from the UBS Defendants the total net loss in value of the Hargen Trust, together with any and all excess commissions, underwriting, administration, and other fees unduly charged by UBS Defendants in connection or in the furtherance of their fraudulent, willful, illegal, malicious, and/or grossly negligent conduct and misrepresentations. These amounts are estimated at $200,000.00.

5.20    Plaintiffs estimate that the total amount to which they are entitled from UBS Defendants from the violations described in this cause of action amount to $966,014.64.

### COUNT IV
*(Breach of Fiduciary Duties)*

5.21    Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.20 of this Complaint.

5.22    UBS Trust failed to execute its fiduciary duties towards the Hargen Trust and Plaintiffs.

5.23    UBS Trust knowingly, maliciously, willfully and/or with grossly negligence engaged in fraudulent conduct, errors of judgment, mistakes of fact or of law, self-dealing, bad-faith, and/or illegal acts or omissions.

5.24    UBS Trust infringed its duties of care, loyalty and good-faith by virtue of its illegal conduct, acts or omissions, errors of judgment, mistakes of fact or of law, self-dealing, and bad-faith.

5.25    As a result, Plaintiffs suffered damages. Hargen-Rodríguez, as beneficiary of the assets of the Hargen Trust for purposes of distribution, and Plaintiffs as owners of the income generated by said assets, suffered net losses that up to this day amount to an excess of $766,014.64, as a result of the conduct described above.

5.26    As a result of UBS Trust's breach of fiduciary duties, Plaintiffs are entitled to recover from the UBS Trust the total net loss in value of the Hargen Trust, together with any and all excess commissions, underwriting, administration, and other fees unduly charged by UBS Trust in connection or in the furtherance of its known, willful, malicious and/or fraudulent conduct and material misrepresentations. These additional amounts are estimated at $200,000.00.

5.27    As such, Plaintiffs are entitled to recovery from UBS Trust in an amount not to be less than $966,014.64, as a result of UBS Trust's breach of its fiduciary duties.

**COUNT V**
***(Breach of Contract)***

5.28    Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.27 of this Complaint.

5.29    UBS Trust, in fulfilling its contractual obligations under the Deed of Trust, has conducted and/or incurred in gross negligence in a manner that contravenes the stipulations of the Deed of Trust. Accordingly, UBS Trust is liable to Plaintiffs and shall be subject to indemnify for the losses and damages caused thereby.

5.30    UBS Trust has breached its contractual obligations towards Plaintiffs to preserve and protect the Hargen Trust's assets and the income it generates. As a result of its gross negligence, the Hargen Trust has lost value in excess of $766,014.64.

5.31    This has caused anguish and suffering to Plaintiffs, in particular the fact that UBS Trust failed to fulfill its promise to Robert Hargen, as Trustee of the Hargen Trust. These additional damages are estimated at $200,000.00.

5.32    Accordingly, Plaintiffs are entitled to recovery from UBS Trust in an amount not to be less than $966,014.64, as a result of UBS Trust's breach of the terms and stipulations in the Deed of Trust and of its contractual duties towards Plaintiffs.

5.33    Plaintiffs estimate that the total amount to which they are entitled from UBS Trust from the violations described in this cause of action amount to $966,014.64.

## COUNT VI
### (Damages for Attorney Fees Incurred in Prior Litigation)

5.34    Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.33 of this Complaint.

5.35    In this case, Plaintiffs suffered damages by having to incur in unnecessary attorney's fees as a result of UBS Trust's negligence due to their failure to contact Sánchez-Carmona at her accurate address, provided to it by Hargen-Rodríguez in its electronic correspondence of October 13, 2003.

5.36    UBS Trust's failure exposed Plaintiffs to liability to Sánchez-Carmona, since UBS Trust was in a perfect position to promptly notify Sánchez-Carmona of her rights as beneficiary of the Hargen Trust and deliver to her the rents and dividends she was owed accordingly.

5.37    UBS Trust's negligence, due to their failure to contact Sánchez-Carmona at her accurate address, provided to it by Hargen-Rodríguez in its electronic correspondence of October 13, 2003, and their failure to follow-up with Hargen-Rodríguez, as requested by him, gave rise to three (3) cases, all hinging on whether or not UBS Trust failed to timely contact Sánchez-Carmona. Plaintiffs were dragged into a litigation whose only source was UBS Trust's own negligent act of failing to contact Sánchez-Carmona after Robert Hargen's death albeit knowing

her marital status and whereabouts, which were timely provided to it by Hargen-Rodríguez in good faith.

5.38    Ordinarily, the litigation should have been between the third-party and UBS Trust since Hargen-Rodríguez never owed any duties to Sánchez-Carmona or her successors, and in any case, exceeded his calling by placing UBS Trust in perfect position to timely and properly contact Sánchez-Carmona or her successors, which it failed to do.

5.39    If UBS Trust had contacted Sánchez-Carmona or her successors at the time Hargen-Rodríguez provided it with the accurate physical and mailing addresses, and her telephone number, and if UBS Trust had paid Sánchez-Carmona the rents and dividends to which she was entitled to as second beneficiary of the Hargen Trust, obligation owed to her by UBS Trust, none of the litigation related to UBS Trust's failure to pay rents when due would have ever taken place and Plaintiffs would not have had to defend themselves in said cases.

5.40    It was foreseeable for UBS Trust that failure to pay rents to Sánchez-Carmona or failure to safely deposit rents on her behalf would become fair grounds for litigation, particularly since Hargen-Rodríguez timely and duly placed UBS Trust in a position to contact Sánchez-Carmona at the time of Robert Hargen's death, and further failed to inform Hargen-Rodríguez of the result of their attempts to contact Sánchez-Carmona, as was requested by him.

5.41    UBS Trust's negligent failure to timely contact Sánchez-Carmona, albeit knowing her accurate contact information since 2003, caused the litigation which resulted in Plaintiffs having to incur in unnecessary attorney's fees in excess of $125,000.00.

5.42    Accordingly, Plaintiffs are entitled to recovery from UBS Trust in an amount not to be less than $125,000.00, as a result of damages in the form of unnecessary attorney's fees incurred in prior litigation by Plaintiffs arising out of and caused by UBS Trust's negligence for

having failed to contact Sánchez-Carmona at her accurate address, provided to it by Hargen-Rodríguez in its electronic correspondence of October 13, 2003.

<u>**COUNT VII**</u>
*(Declaratory Judgment)*

5.43    Plaintiffs hereby incorporate by reference paragraphs 1.1 through 5.42 of this Complaint.

5.44    Hargen-Rodríguez is the sole beneficiary of the Hargen Trust and may seek immediate distribution of all of its assets, without delay.

5.45    Plaintiffs never had a duty to perform, of any kind, towards Sánchez-Carmona or towards Defendants. In any case, Hargen-Rodríguez exceeded any foreseeable obligation by timely and properly notifying UBS Trust with Sánchez-Carmona's accurate physical and mailing address, and telephone number.

5.46    Plaintiffs acted in good faith and within the parameters of the law.

5.47    UBS Defendants made material misrepresentations and omissions of fact in the sale of securities, through means of mail, electronic mail, telephone calls and media publications, all of which affect interstate commerce, constituting violations of Section 10(B) of the Exchange Act and Rule 10b-5(A). Specifically, in the sale of CEFs shares to the Hargen Trust, as alleged above.

5.48    UBS Defendants conducted and participated in its affairs through means of mail, electronic mail, telephone calls and media publications, all of which affect interstate commerce, and engaged in the fraudulent sale of securities in violation of Section 10(B) of the Exchange Act and Rule 10b-5(A), a statutorily defined racketeering activity.

5.49    UBS Defendants carried out two or more acts of racketeering activity within ten years, namely the fraudulent sale of securities to the Hargen Trust between 2003 and 2008, and

through the use of UBS PR, UBS Trust and their control of the CEFs, by having its personnel occupy prominent positions at the CEFs boards of directors, engaged in the fraudulent sale of securities with the purpose of generating profits that otherwise would not have been possible without UBS Defendants' illegal conduct.

5.50    As a result, the Hargen Trust lost over $766,014.64 in assets, effectively thwarting Robert Hargen's intention and desire when he established the Hargen Trust. Plaintiffs' stream of income, conjugal property, has also diminished as a result and Hargen-Rodríguez is obliged to realize the losses generated from the fraudulent acquisition of CEFs shares at the hands of UBS Defendants, together with UBS Trust and UBS Financial.

5.51    In addition, Plaintiffs suffered injuries and are entitled to recover any and all loss of income, excess commissions, underwriting, administration, and other fees unduly charged by UBS Defendants in connection or in the furtherance of their illegal and fraudulent conduct. These amounts are estimated at $200,000.00.

5.52    Plaintiffs also suffered injuries in the form of mental anguish and suffering by knowing that the last will of Robert Hargen failed to materialize as a result of UBS Defendant's illegal and fraudulent conduct. These damages are estimated at $200,000.00.

5.53    UBS Trust failed to discharge its fiduciary duties towards the Hargen Trust and Hargen-Rodríguez, by not contacting Sánchez-Carmona after Robert Hargen's death in spite of having all the necessary information to contact her, including her accurate physical address and telephone number, provided to them by Hargen-Rodríguez via e-mail on October 13, 2003.

5.54    UBS Trust failed to execute its fiduciary duties in charge of the execution of the Hargen Trust. UBS Trust engaged in gross negligence and infringed its duties of care, loyalty

and good-faith by virtue of its conduct, material misrepresentations, errors of judgment, mistakes of fact or of law.

5.55    Finally, UBS Trust negligently failed to timely contact Sánchez-Carmona, albeit knowing her accurate contact information since 2003. Its negligence caused a litigation which resulted in Plaintiffs having to incur in unnecessary attorney's fees in excess of $125,000.00.

5.56    Accordingly, Plaintiffs are entitled to recovery from UBS Trust in an amount not to be less than $125,000.00, as a result of damages in the form of unnecessary attorney's fees incurred in prior litigation by Plaintiffs, arising out of and caused by UBS Trust's negligence for having failed to contact Sánchez-Carmona at her accurate address, provided to it by Hargen-Rodríguez in its electronic correspondence of October 13, 2003.

**WHEREFORE**, Plaintiffs, Paul T. Hargen-Rodríguez, María L. Amaral-Biblioni and their conjugal partnership ("Plaintiffs"), pray for judgment as follows:

(A)    ORDER UBS Defendants to pay Plaintiffs, jointly and severally, an amount not less than $966,014.64, pursuant to violations of Section 10(b) and 15(c) of the 1934 Securities Exchange Act, 15 U.S.C.A. §§ 78j(b) & 78o(c), and/or SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, with interest thereon at the current applicable legal rate;

(B)    ORDER UBS Defendants to pay Plaintiffs, jointly and severally, an amount not less than $2,898,043.92, pursuant to violations of 18 U.S.C. 1962(c), which include treble damages provided by 18 U.S.C. § 1964(c), with interest thereon at the current applicable legal rate;

(C)    ORDER UBS Defendants to pay Plaintiffs, jointly and severally, an amount not less than $966,014.64, pursuant to violations of Article 410 of

Law No. 60 of June 18, 1963, as amended, known as the Puerto Rico Uniform Securities Act, 10 L.P.R.A. § 890 (P.R. Laws Ann. Tit. 10 § 890), with interest thereon at the current applicable legal rate;

(D)    ORDER UBS Trust to pay Plaintiffs an amount not less than $966,014.64, as a result of UBS Trust's breach of its fiduciary duties, pursuant to Article 862 of the Puerto Rico Civil Code, 31 L.P.R.A. § 2569, with interest thereon at the current applicable legal rate;

(E)    ORDER UBS Trust to pay Plaintiffs an amount not less than $966,014.64, as a result of UBS Trust's breach of the Deed of Trust, pursuant to Article 1054 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3018, with interest thereon at the current applicable legal rate;

(F)    ORDER UBS Trust to pay Plaintiffs an amount not less than $125,000.00, as damages in the form of unnecessary attorney's fees incurred in prior litigation by Plaintiffs caused by UBS Trust's negligence for failing to timely contact Sanchez-Carmona, albeit having her accurate contact information since 2003; pursuant to Article 1054 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3018, with interest thereon at the current applicable legal rate;

(G)    GRANT Plaintiffs Count VII for Declaratory Judgment, as alleged and stated above;

(H)    AWARD Plaintiffs punitive damages where applicable;

(I)    AWARD any such other relief as this Court deems just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this July 8, 2016.

**SEPULVADO & MALDONADO, PSC**
***Attorneys for Paul T. Hargen Rodríguez***
Citibank Towers, Suite 1900
252 Ponce de Leon Avenue
San Juan, PR 00918
Telephone (787)765-5656
Fax (787)294-0073


*s/ Lee R. Sepulvado Ramos*
LEE R. SEPULVADO RAMOS
USDC-PR 211912
lsepulvado@smlawpr.com


*s/ Albéniz Couret Fuentes*
ALBÉNIZ COURET FUENTES
USDC-PR 222207
acouret@smlawpr.com


*s/ Aníbal J. Núñez-González*
ANÍBAL J. NÚÑEZ GONZÁLEZ
USDC-PR 230101
anunez@smlawpr.com
